# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

| | | |
|---|---|---|
| MELVIN INGRAM; | JACOB GREENWELL; | DARRELL ONSBY; |
| SHANTEL ADAMS; | LAWONDA HODGES; | FREDERICK RAYFORD; |
| DAVID BECK; | LAROME HUMPHREY; | JOHN RILES; |
| DWYANE BOWENS; | ROBERT KATALTEPE; | ASHLEY ROBERTSON; |
| ALFREDO CARDENAS; | JOHN LINTNER; | DEANDRE ROSSER; |
| VERONICA CLEAVES; | KEESHA MCCLINTON; | DUSTIN RUSSELL; |
| MARCUS COCHRAN; | LAKISHA MCCOY; | PATRICK SHAW; |
| ROBERT COLUCCI; | CLIFTON MCCOY; | CEDRIC TAYLOR |
| LESLIE CREWS; | DEDRECK MCVAY; | JESSE TOWNSEND; and |
| ERIC FLAKE; | HARRY OLIVER; | STEVEN WESBY; |

Individually and as potential class
Representatives for all similarly
Situated claimants                                   )
       **PLAINTIFFS**                                   )
                                                                         )
**VS.**                                                                   )   NO:_____
                                                                         )
BILL OLDHAM, in his individual capacity    )   **CLASS ACTION COMPLAINT**
and in his official capacity as the Sheriff of )   **FOR VIOLATIONS OF THE CIVIL**
Shelby County, Tennessee; ROBERT           )   **RIGHTS ACT OF 1871, 42 U.S.C. §**
MOORE, in his individual capacity and in   )   **1983 AND TENNESSEE COMMON**
his official capacity as the Jail Director of  )   **LAW**
the Shelby County, Tennessee; CHARLENE )
McGHEE, in her individual capacity and in  )   **JURY TRIAL DEMANDED**
her official capacity as the of Assistant Chief )   **PURSUANT TO FED. R. CIV.**
Jail Security of Shelby County, Tennessee;  )   **P. 38(a) & (b)**
DEBRA HAMMONS, in her individual           )
capacity and in her official capacity as the )
Assistant Chief of Jail Programs of Shelby  )
County, Tennessee; SHELBY COUNTY,          )
TENNESSEE, a Tennessee municipality;       )
and TYLER TECHNOLOGIES, INC., a            )
foreign corporation, and other unknown      )
and unnamed Individuals and Entities,        )
       **DEFENDANTS**                                   )

---

## CLASS ACTION COMPLAINT

---

1

Plaintiffs identified herein, on behalf of themselves and all other similarly situated persons, by and through their designated attorneys, and for their Class Action Complaint allege as follows: All allegations in this Complaint are based upon the investigation of counsel, except the specific allegations pertaining to the named Plaintiffs, which are based upon personal knowledge. As of the date of this Complaint, no discovery has been conducted. As a result, it is likely that once the discovery process is underway, the named Plaintiffs will seek leave to amend their Complaint to add new factual allegations and/or new claims.

## I.      NATURE OF THE ACTION

1.      This is a class action brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 ("Section 1983"), 1988, and Tennessee common law in order to remedy Defendants' actions in causing hundreds of Shelby County arrestees to be deprived of their constitutional rights by subjecting them to, inter alia, (i) unlawful detention by denying them the ability to post bonds that were pre-set, (ii) unlawful detention by detaining them longer than forty-eight (48) hours prior to probable cause determination either delaying their release for lack of probable cause or delaying having their criminal bonds set and posted, (iii) unlawful detention by detaining them longer than six hours after posting their required bonds, (iv) detaining them longer than six hours after charges against them had been dismissed or it was determined that probable cause did not exist to detain them, and/or, (v) re-arresting them on warrants that had previously been served and satisfied (i.e., re-arresting them on the identical warrant that had been previously served)., all of which has proximately caused these arrestees to be unlawfully detained and, thus, suffer damages. The named Plaintiffs and Class Members seek declaratory and permanent injunctive relief as well as an award of compensatory damages against Defendants.

## II.  SUBJECT MATTER JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under Section 1983 and 1988.

3.     With respect to the state law claims against Defendant Tyler Technologies, Inc., this Court also has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Under § 1332(c)(2), the named Plaintiffs are citizens of Tennessee (and two-thirds or more of the Class Members are citizens of Tennessee). Pursuant to § 1332(d)(10), Defendant Tyler Technologies Inc. is a corporation organized under the laws of the Delaware, with its principal place of business in Plano, Texas, and, as such, is a citizen of the States of Texas and Delaware. As a result, the named Plaintiffs and Defendant are citizens of different States, pursuant to § 1332(d)(2)(A).

4.     Upon information and belief, the proposed Class exceeds 100 persons. Pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00 and thus exceeds the requisite amount in controversy set forth in §1332(d)(2).

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## III.  PARTIES

6.     Melvin Ingram was arrested on or about midnight on November 9, 2016 and charged with Driving While a Habitual Motor Vehicle Offender. He was taken to the Shelby County Jail and informed that his bond could not be set due to "computer issues." Mr. Ingram was specifically informed by intake employees at the Shelby County Jail that he would likely be detained an extraordinary amount of time due to the non-functioning computer system. Mr. Ingram

spent almost the entire day November 9, 2016 (from 2 am in the morning until midnight) at 201 Poplar waiting for his bond to be set. His bond was finally set at approximately 2 pm on November 10, 2016, at which time his sister paid his bond, and he was released that evening.

7. Shantel Adams was arrested on November 9, 2016 at approximately 10 am and charged with Aggravated Assault. She was taken to Shelby County Jail East Women's Detention Facility in Memphis, TN.  Ms. Adam's sister went to A&A Bail Bonds to secure Ms. Adams' bail bond but was informed that Ms. Adams did not yet have a bond. Ms. Adams herself was told by jail personnel that she was not in the Shelby County Jail's computer system, and the setting of her bond had been seriously delayed as a direct result of the same. Ms. Adam's bond was not set by the jail until approximately 8 pm on November 10, 2016. After paying the said bond, her sister had to drive to Jail East personally, because Ms. Adams was still not showing up in the computer system, and the jail denied that she was incarcerated there.

8. David Andrew Beck was transferred from Shelby County Correctional Center on November 1, 2016, in connection with a "hold" for a potential parole violation from Louisiana, to the Shelby County Jail at 201 Poplar Ave. On or about November 3, 2016, he was released from the "hold" by Louisiana, and this fact was relayed to Shelby County Government on that same date. Mr. Beck was informed by Shelby County Jail employees that Defendant's computer system was down and that processing was being performed by hand, and therefore, there would be serious delays in processing his release. He was released on November 17, 2016.

9. Dwayne Bowens was scheduled for a court appearance on December 1, 2016, for Driving While License Suspended. At approximately 10:30 am Bowens was placed in jail, and a $250 bond was set. Bowens' wife was present for the court appearance and immediately paid his bond. However, at about 1-2 pm, Bowens remained in jail and therefore asked a bailiff if his bond

4

was paid. The bailiff confirmed Bowens was in the system, but Bowens continued to remain in the custody of the jail. Bowens continued to ask different bailiffs in attendance when he could be released because his bond was already paid. Bowens was consistently told on each occasion that the jail staff was doing its best, but things were out of control due to issues with the jail computer system. Bowens was not released from jail until December 2, 2016, at about 3 pm.

10.    Alfredo Cardenas was arrested on December 20, 2017 and charged with driving under the influence. On April 7, 2017 Mr. Cardenas pled guilty and received probation and 23 hours of confinement. Although driving under the influence has a minimum sentence requirement of 48 hours, Mr. Cardenas had credit for 25 hours, thus he only needed to serve 23 hours. Despite only needed 23 hours, Mr. Cardenas was "lost in the system" due to issues with the jail computer system, and was not released for three days.

11.    Veronica Cleaves was charged with domestic assault and arrested on December 1, 2016 at approximately 9:30 am and held without a bond until December 4, 2016. At first she was told that the delay was a 12-hour domestic assault hold, but later the jailors admitted she was not in the computer system and everything was taking longer due to computer system problems. Although her family attempted to post the bond on several occasions, they were told by the bondsmen that no bond was entered into the computer system. Ms. Cleaves was finally arraigned on December 5, 2016, though her family was unable to post bond until December 6, 2016.

12.    Marcus Cochran was arrested on February 23, 2017, but he was not told he had a bond for almost three days. While in jail Mr. Cochran was denied essential medical care as the jail personnel were overwhelmed due to overcrowding. Mr. Cochran was told that delays with his medical care and failure to notify him of a bond were caused by problems with the jail computer system.

13.     Robert Colucci was arrested on and around November 13, 2016, and charged with an alleged domestic assault. He was taken to the Shelby County Jail at 201 Poplar Ave. There, he spent two nights in a holding cell. On November 15, 2016, he was moved to a cell, and released later on November 16, 2016. Mr. Colucci was informed by Shelby County Jail employees they did not know how to operate Defendant's new computer system to access his information. He was also informed there would be serious delays in the setting and processing of his bond.

14.     Leslie Brooke Crews was taken into custody on January 31, 2017 on a mittimus, after being sentenced on a DUI case. Ms. Crews was scheduled to be released on February 1, 2017 at 6 pm, unfortunately she was not released until Thursday, Feb 2, 2017, well after the mittimus indicated she had served her time. A Captain at the jail notified her that she was not released as scheduled because the jail had faulty information showing a previously recalled warrant was still active.

15.     Eric Flake was arrested and charged with Burglary of a Motor Vehicle on January 24, 2017, and was booked on Jan 25, 2017. His video arraignment took place on January 30, 2017, and at such time there was no record of him in the computer system, and they had to write him onto the court docket by hand.  A bond was not set until January 29, 2017, though he wasn't told he had received one until January 30, 2017.

16.     Jacob Greenwell learned that he had a bench warrant, and thus retained an attorney and returned to court on November 10, 2016. Mr. Greenwell's bench warrant was successfully recalled, and he was placed back on the court docket and given a new court date. On November 11, 2016, Mr. Greenwell was re-arrested and taken to 201 Poplar. Mr. Greenwell explained numerous times to police that his warrant had been recalled the day before. Mr. Greenwell was told numerous times by the jail intake personnel that he wasn't showing up in the computer system.

6

On November 13, 2016, he was finally told that he was being released, though he never received any explanation of why he was jailed. During the time period he was incarcerated, Mr. Greenwell stayed in the intake area of 201 Poplar, and a bed was never made available, and he was forced to lie on the floor to rest.

17.     Lawonda Hodges had a warrant for her arrest issued on September 19, 2016 by the City of Bartlett regarding a failure to pay fines and court costs. She was later arrested in October 2016 and paid all of said fines and court costs and was explicitly informed that the warrant had been cleared from the system. On November 9, 2016 police officers appeared at Ms. Hodges' residence and attempted to arrest her concerning the aforementioned warrant; she was detained and in custody for approximately 30 minutes. Eventually, the officers discovered that the warrant they were pursuing had been cleared by the initiating agency. Later the same day, Ms. Hodges was detained yet again by Shelby County Sheriff's officers for the same warrant. She was pulled over in her vehicle for a window tint violation, but said routine traffic stop was unduly prolonged as agents of the Defendant continued to act under the invalid arrest warrant. Yet again on November 10, 2016, Ms. Hodges was detained by Memphis Police Department officers – pursuant to a routine traffic stop - on the same invalid arrest warrant. As of January 26, 2017, Ms. Hodges was still reported in the Defendant's electronic fugitive bureau.

18.     LaRome Humphrey was arrested on and around November 8, 2016 and taken to the Shelby County Jail at 201 Poplar Ave. Mr. Humphrey was not made aware of his scheduled court date, which he missed, and therefore a bench warrant was issued for his arrest. Mr. Humphrey was informed by Shelby County Jail employees that Defendant's computer system was down and processing was being performed by hand, and therefore there would be serious delays in the setting and processing of his bond.

19.     Robert Kartaltepe was arrested on Sunday, November 6, 2016 for Burglary of a Motor Vehicle and was held without a bond until November 9, 2016. Although he posted his bond on November 10, 2016, he was not released until November 11, 2016. Mr. Kartaltepe was held for three days in the intake area of 201 Poplar, and was forced to sleep on the floor. He was told by jail personnel that this was due to overcrowding, caused by problems with the jail computer system.

20.     John Lintner was arrested in Germantown on February 2, 2017. After his arrest, Mr. Lintner was taken to the Shelby County Jail at 201 Poplar, and thereafter transferred back and forth for court in Germantown on February 8, 2017 and February 16, 2017. While at 201 Poplar he was told there were overcrowding issues due to the computer system. During his stay in 201 Poplar he was denied two key medications for his bipolar condition because the medical system in the jail was so overwhelmed. By February 11, 2017 he was becoming manic due to lack of necessary medication. He finally was given access to a jail psychiatrist on Feb 14, 2017, and received his medication before being released on February 16, 2017.

21.     Keesha McClinton was arrested on January 21, 2017 for allegedly violating an Order of Protection. Ms. McClinton was held in jail and was not told that she had been given a bond. She was not able to post bond until January 26, 2017. Ms. McClinton had been stabbed before her arrest, and while incarcerated, she was denied adequate medical treatment, including staples and stiches in her face, elbow, and arm that were bleeding through due to inadequate bandaging and treatment. She was told this was due to medical personnel being overwhelmed due to overcrowding related to the jail computer system.

22.     Lakisha McCoy was taken into custody on or about November 3, 2016, for an alleged violation of probation. She was taken to the Shelby County Jail at 201 Poplar Ave., and

8

subsequently to the Women's Jail at the Shelby County Correctional Center, known as Jail East. On November 4, 2016, she was not taken to Court because she was told the computer system was down and the Court did not have her paperwork. Ms. McCoy's attorney subsequently obtained a bond for Ms. McCoy. Ms. McCoy was issued a $5,000.00 bond, and it was paid at about 3 pm that day. However, Jail East employees told Ms. McCoy Defendant's computer system was down, and therefore, there they could not provide her any information on her bond. On November 6, 2016, she was finally released from custody.  On November 7, 2016, Ms. McCoy appeared at Court but was told she was not on the docket because the system was down. Accordingly, she was scheduled for another court date. However, later that day, the Shelby County Sheriff's office called Ms. McCoy, demanding she turn herself in because there remained an active warrant for her arrest. At 6 a.m. on November 8, 2016, Sheriff Deputies began banging on her window, informing her they had a warrant for her arrest. She showed the Deputies her jail release paperwork, and they verified it by telephone. Later that same evening, Memphis Police Department arrived at her home ready to arrest her, based on an active warrant. Again, she showed the police her release paperwork, and they verified it by telephone. At 6 a.m. on November 9, 2016, Sheriff's Deputies arrived at her home again, ready to arrest her based on the active warrant. Again, she showed them her release paperwork, and they verified it by telephone. By this stage, Ms. McCoy was greatly distressed and called Chief Director Robinson at the Sheriff's office to inform him she was going to the media about police harassment. Director Robinson offered his apologies, confirmed her warrant remained active because of problems related to Defendant's new computer system, and asked her not to go to the media. However, Ms. McCoy was so distressed by her treatment she met with a Channel 3 reporter on November 10, 2016, and was part of a news story that aired later that evening.

9

23.     Clifton McCoy was taken into custody by the Defendant on November 16, 2016, at approximately 7:30 in the morning. Over 12 hours later, at approximately 8:00 pm Mr. McCoy's girlfriend, Shakira Martin, appeared at Allied Allday-Allnight, Inc. Bonding Company and attempted to pay for Mr. McCoy's bond; this was an impossible endeavor as Mr. McCoy's charge and bond amount had not been put in the computer system. Allied Bonding Company was not able to obtain this information through the computer system. Eventually, the bond amount was discovered after strenuous effort, and the bond paid at 4:00 am the morning of November 17, 2016.

24.     Dedreck McVay was arrested after a traffic stop on November 4, 2016 and told by the officer he had warrants. Mr. McVay was held in the jail booking area for three days, during which time he was not given a bond, nor was he allowed to make a phone call. Mr. McVay was not allowed to sleep in a bed until the third or fourth day when he was taken into the gym and given a "plastic boat shaped" object to sleep in. There was no easy access to a bathroom, and inmates had to bang on the door to get a deputy to escort them to a bathroom. This system persisted until an inmate defecated on himself. Mr. McVay was finally taken to a cell on or about November 11, 2016.

25.     Harry Oliver was arrested on or about November 4, 2016 in connection with an alleged burglary and taken to the Shelby County Jail at 201 Poplar Ave. Mr. Oliver was informed by Shelby County Jail employees that the computer system was down and processing was being performed by hand. He was informed that there would be serious delays in the setting and processing of his bond. Mr. Oliver was permitted a bond on November 7, 2016.

26.     Darrell Onsby was arrested on November 19, 2016, and charged with Possession of a Controlled Substance with Intent. Mr. Onsby was not arraigned until November 28, 2016, and on that date he was given a bond. He spent two days in the holding area with more than seventy

men. Gang members took over the phones, and the guards were too overwhelmed to do anything about it. He was told by jail personnel that his name was not in the computer system which caused the delay in getting a bond and a court date.

27.     Fredrick Rayford was arrested on November 6, 2016 due to a domestic disturbance, and was taken to 201 Poplar. While at 201 Poplar, Mr. Rayford was forced to stay in the intake area for two days, and slept in a chair. He was not given immediate access to a bathroom, and had to find a jailer to take him. By November 8, 2016 Mr. Rayford was still being held, and had not been given a bond because he was "not in the system." Further, the jailer kept checking his wristband and telling him he had the wrong number. The jailers explained the difficulties were due to the computer system being down, and they were having to "do everything by hand."

28.     John Riles was arrested on December 12, 2016 and charged with domestic assault. He was taken to 201 Poplar where he was held without a bond until December 22, 2016. The jailers "did not know what was going on" due to issues with the jail computer system. People were housed for days in the jail intake area without getting a bond, and the jail personnel did not even know what they were charged with. They were all forced to sleep on the floor. While in jail he was given medication that he should not have been prescribed because he was allergic to it, and he "went crazy on it."

29.     Ashley Robertson was arrested on and around November 12, 2016, and charged with alleged Aggravated Assault. She was taken to the Shelby County Jail at 201 Poplar Ave, then Memphis Women's Jail East, where she remained until November 17, 2016, despite being released on her recognizance by the Court on November 15, 2016. She was initially denied a scheduled court appearance despite sitting in the holding cell adjacent to the courtroom between 9 a.m. and 5 p.m. On November 15, 2016, she was informed by Jail East employees that her bond was set at

$20,000.00. That day she was taken to Court, where she was released "ROR," meaning released on her own recognizance. After being transferred back to Jail East, and expecting to be released, she was told to wait in a cell because the computer system did not verify she was to be released. This situation continued for two further days whereby she was prevented from leaving the Jail's custody.

30.     Deandre Rosser was arrested on January 4, 2017 and charged with Aggravated Burglary. Mr. Rosser was forced to wait for approximately 36 hours to be booked and processed and to get his bond. His bondsman looked for him on several occasions but said he was "not in the system." Even after posting his bond, he was still not showing up in the computer system and was not immediately released from jail.

31.     Dustin Russell was arrested on November 7, 2016 and charged with aggravated assault. Mr. Russell was held in the intake area for 3 days and was forced to sleep in a chair with no blankets. He was then taken to a metal "tank" with metal benches and no restrooms, and later to a gym where he slept in a plastic box. For several days his father went from bonding company to bonding company where he was always told the same thing, that Mr. Russell was "lost in the system."  While he was in jail, Mr. Russell, was not told he had a bond, informed of the charges against him, or assigned a court date for nearly three weeks.

32.     Patrick Shaw was arrested on or about November 4, 2016 in connection with an alleged burglary and was taken to the Shelby County Jail at 201 Poplar Ave. Mr. Shaw was informed by Shelby County Jail employees that the computer system was down and processing was being performed by hand. He was informed that there would be serious delays in the setting and processing of his bond. He was permitted a bond and released on November 7, 2016.

33.     Cedric Taylor was pulled over by police on or about April 14, 2017 for driving while license suspended. Although the officer initially began to fill out a misdemeanor citation form, a few minutes later the officer notified Mr. Taylor that he had an active warrant, and took him to jail at 201 Poplar. Mr. Taylor was held for 24 hours at 201 Poplar before jailers were able to determine that he did not have a warrant, and they had him mixed up with another person. A few months later, on June 28, 2017, Mr. Taylor was riding as a passenger with a friend, when the friend was pulled over by police. Upon the officer checking his identification he informed Mr. Taylor that he had a warrant. Mr. Taylor was again taken to 201 Poplar, and this time it took 3 days for jailers to determine that he did not have a warrant, because they could not pull him up in the computer system, and when they did they found they had again confused him with another person.

34.     Jessie Townsend was arrested on February 1, 2017 on a Petition to Revoke Suspended Sentence. After his arrest, Mr. Townsend was not taken before a judge until March 6, 2017. At that time Mr. Townsend was finally assigned a bond. He was told the reason it took so long to get a bond was because the computer system was down, and they had lost track of court dates. Only after the efforts of private counsel was he able to secure a court date.

35.     Steven Wesby was arrested on November 13, 2016 in connection with a domestic disturbance and taken to the Shelby County Jail at 201 Poplar Ave. Mr. Wesby asked jail employees numerous times about his bail bond, and was told many times to sit and wait until he heard otherwise. Despite the means to pay a bond, on November 14, 2016 Mr. Wesby was still in jail without a bond set. He was briefly taken to court that day, but was told that he was "not on the docket," and was taken back to the jail. On November 15, 2016, he was again taken to court and a bond of $75,000 was announced by the judge on his case. Despite the fact that the judge had

13

announced a bond in court, his sister was unable to post his bond, because the bond company told her that there was no bond in the system. Mr. Wesby also confirmed with jail employees that no bond was in the system due to computer system difficulties, which prevented him from posting a bond and being released. Mr. Wesby's bond finally appeared in the system on November 19, 2016, at which time his family posted the bond, and he was released the next morning. Mr. Wesby was damaged by this incident in a specific amount to be proven at a hearing of this cause.

36.     Defendant Bill Oldham (hereinafter "Defendant Oldham" or "the Sheriff") is the Sheriff of Shelby County, Tennessee and may be served with process at 201 Poplar Avenue, 9th Floor, Memphis, Tennessee 38103. Defendant Oldham is named in this action both in his individual capacity and his official capacity as the Sheriff of Shelby County.

37.     Defendant Robert Moore (hereinafter "Defendant Moore" or "the Chief Jailor") is the Chief Jail Director of the Shelby County Jail and may be served with process at 201 Poplar Avenue, 9th Floor, Memphis, Tennessee 38103. Defendant Moore is named in this action both in his individual capacity and his official capacity as the Chief Jail Director of the Shelby County Jail.

38.     Defendant Charline McGhee (hereinafter "Defendant McGhee" or "the Assistant Chief ") is the Assistant Chief of Jail Security of the Shelby County Jail and may be served with process at 201 Poplar Avenue, 9th Floor, Memphis, Tennessee 38103. Defendant McGhee is named in this action both in her individual capacity and her official capacity as the Assistant Chief of Jail Security of the Shelby County of the Shelby County Jail.

39.     Defendant Debra Hammons (hereinafter "Defendant Hammons" or "the Jail Programmer") is the Assistant Chief of Jail Programs of the Shelby County Jail and may be served with process at 201 Poplar Avenue, 9th Floor, Memphis, Tennessee 38103. Defendant Hammons

14

is named in this action both in her individual capacity and her official capacity as the Assistant Chief of Jail Programs of the Shelby County Jail.

40.      Defendant, County of Shelby, Tennessee is a county government organized under the laws of the State of Tennessee, which operates the Shelby County Jail and the Shelby County District Attorney's Office and it can be served with process to the chief executive officer, the Office of the Mayor, Mark Luttrell, or the county attorney, located at 160 North Main Street, 11th Floor, Memphis, TN 38103, pursuant to Tenn. R. Civ. P. Rule 4.04 (7).

41.      Defendant Tyler Technologies, Inc. (hereinafter referred to "Defendant Tyler Tech.") is a corporation organized under the laws of the State of Delaware, with its principle place of business located at 5101 Tennyson Parkway, Plano, Texas 75024. Service of process may be accomplished on Defendant through its registered agent for service of process, Capitol Corporate Services, Inc. located at 992 Davidson Drive, Suite B., Nashville, Tennessee 37205.

42.      This Court has both general and specific personal jurisdiction over Defendants because each Defendant has had substantial and continuous contact with Tennessee. As a result, this Court has personal jurisdiction over Defendant pursuant to TENN. CODE ANN. §§ 20-2 214(1) and (2) and (6) and 20-2-223(1), (3) and/or (4) on the grounds that the claims asserted against it arise from its transaction of business within Tennessee and on the grounds that it has committed a tortious act within Tennessee. Furthermore, Defendants' contacts and actions were directed toward Tennessee and thus warrant the exercise of personal jurisdiction over it pursuant to TENN. CODE ANN. § 20-2-225(2).

43.      Based on information and belief and the entire record in this case, Plaintiffs contend that other unknown and unnamed individuals may be responsible for part of the causes brought

herein. Plaintiffs hereby reserve the right to add these persons/entities once their identities become known.

## IV.    FACTUAL ALLEGATIONS

### A.    Summary of Class Allegations

44.    For almost twenty years, the Shelby County Jail (the "Jail") has employed a computer system known as "JSSi" to process and track the arrest files, criminal cases and court records of inmates at the Jail (hereinafter referred to as the "Criminal Tracking System") so as to carry out its administrative policies governing, inter alia, the posting of bonds, the pre-trial probable cause determination of arrestees, the release of arrestees whose bonds have been posted, the release of arrestees whose arrests were not supported by probable cause or whose cases had been dismissed and the confirmation that arrest warrants have been in fact carried out and satisfied. The JSSi system appears to have worked quite well during this time frame.

45.    However, in October 2016, in an effort to replace the JSSi so that more government agencies could receive criminal information, the County rolled out a new Computer Tracking System which it denominated as "the Shelby County Integrated Criminal Justice System (iCJIS) Roadmap." At the heart of this new Computer Tracking System is a software platform created, marketed and implemented for the County by Defendant Tyler Tech known as "Odyssey."

46.    The County, however, was warned and/or should have had knowledge that the Odyssey system would not work and that the tracking and protection of Jail arrestees could and would be jeopardized if it were adopted.

47.    The County ignored these dire warnings by recklessly choosing to implement the Odyssey system. Indeed, the County's unreasonably inefficient implementation of the Odyssey

system constituted deliberate indifference with respect to Plaintiffs and the Class Members thereafter by causing inmates to linger for days and weeks in the Jail in direct violation of their constitutional rights.

48.     For example, Defendants, acting with deliberate indifference, failed to permit many arrestees to post bonds that were preset by their arrest warrants or civil writs of attachment of the person, causing these persons to be imprisoned for days and even weeks – often over petty crimes such as driving on a suspended license and public intoxication. Moreover, when these arrestees actually were allowed to post bond (and in fact did so), the County nevertheless recklessly failed to acknowledge their bond postings, thus continuing to unlawfully detain them.

49.     Additionally, Defendants, with deliberate indifference, failed and refused to process and arraign arrestees so that their bonds could even be set, causing them to be detained for days and even weeks without a bond setting.

50.     The County further failed to release prisoners whose cases had been dismissed, detaining them for days and weeks before determining that there were court orders dismissing the charges against them.

51.     Lastly, the County's deliberate inaction caused many persons who had been arrested and released to be re-arrested on the same warrant, again in violation of their constitutional rights.

52.     Plaintiffs allege that the County's unreasonably inefficient implementation of its administrative policies, as specifically enforced by the individual Defendants named herein, amounts to a policy of deliberate indifference and/or inaction to their constitutional rights.

**B.      The County Establishes an IT Steering Committee that is Told the Odyssey Software Will Not Work.**

53.      The County formed an IT Steering Committee from the Shelby Count Criminal Justice Coordinating Council to study an overhaul of the JSSi Computer Tracking System. JSSi tracked the initiation and disposal of over 28,000 criminal cases per year. The selection and implementation of its replacement system constitutes a custom, policy or practice in that the Defendants made a deliberate choice to follow a course of action made from among various alternatives and the Defendants were the officials responsible for establishing the final policy with regard to implementing a competent and efficient Computer Tracing System.

54.      The IT Committee established an iCJS Executive Committee of which the Sheriff was a member. The IT Committee received request for proposals from a number of independent contractor software vendors, including Defendant Tyler Tech. Defendant Tyler Tech promoted to the County the purchase and implementation of its Odyssey Case Management System, claiming that it could provide a fully integrated court and justice solution with up to date information.

55.      Upon information and belief, the Sheriff and the County received information from various members of the IT Steering Committee that the Odyssey software was not compatible with the needs of the Computer Tracking System and would not be appropriate. For example, Criminal Circuit Court Judge Lee Coffee told this committee that the Odyssey Case Management platform would simply not work well and that another solution should be sought out.

56.      As a result, the Sherriff and the County were expressly on notice that Odyssey was incapable of serving as a proper Computer Tracking System. Indeed, several other counties around the country have experienced significant problems with Defendant Tyler Tech's Odyssey.

57.      In 2011, Ector County of Odessa, Texas experienced data loss and other significant problems with Odyssey; in fact, these problems were so significant that it withheld payment from

18

Defendant Tyler Tech. In 2011, Merced County California experienced a breakdown in communications between the criminal court and the jail which were caused by Odyssey. Likewise, in 2014, Cameron County Texas also experienced significant problems with its tracking of inmates caused by Odyssey.

58.     Lastly, earlier this year, Alameda County, California's Odyssey caused havoc with its criminal justice system.

59.     Defendant Tyler Tech knew or should have known that Odyssey was not a good fit for the County's needs. Specifically, upon information and belief, Defendant Tyler Tech's Odyssey is a platform that, in order to be successful, must be perfectly compatible with the other aspects of the government entity's system.

60.     Instead of altering Odyssey to conform to the government entity's system, Defendant Tyler Tech attempted to "shoehorn" the government entity's system to Odyssey in order to "make it fit." Defendant Tyler Tech did so in order to save money that would require significant custom changes to Odyssey. It is this "one size fits all approach" that caused the massive and disturbing problems with the County and the Jail as described below.

61.     In spite of the severe concerns regarding Odyssey's implementation, the County recklessely and/or intentionally failed to adequately test the system despite having been apprised of the necessity of doing so.

**C.     Defendant Tyler Tech Negligently Integrates Odyssey in a Manner that Leads to Computer Tracking System Miscues and Negligently Supervises Its Employees and the County's Employees.**

62.     On July 22, 2013, Defendant Tyler Tech and the County entered into a Contract (the "Contract") which was a self-described ... "[c]ontract … for Court Management System." The Contract denominated Defendant Tyler Tech as a "Provider" of software and case management

systems, stating that "All Services by the PROVIDER will be performed in accordance with the generally accepted business practices and standards prevalent in PROVIDER'S industry" and that "PROVIDER certifies that it presently has adequate qualified personnel to perform all Services required under this Contract."

63.     As a result, Defendant Tyler Tech was clearly engaged in the provision of services for which Tennessee's "economic loss doctrine" has no application. *See Ham v. Swift Transp. Co.,* 694 F. Supp. 2d 915, 922 (W.D. Tenn. 2010) (holding that the economic loss doctrine does not apply to the provision of services, stating "Tennessee Court of Appeals has since implicitly restricted the economic loss doctrine to claims involving products liability or the sale of goods"); *Tan v. Wilbur Smith Assoc.,* Case No. 2:09-cv-25, 2011 U.S. Dist. LEXIS 86433 (E.D. Tenn. Aug. 4, 2011) ("the Court agrees that the economic loss rule is applicable to the sale of goods, but does not extend equally to contracts for the provision of services. Therefore, the rule is inapplicable to the instant case, which concerns a contract for services"); *N5ZX Aviation, Inc. v. Bell,* No. 3-11-0674, 2011 U.S. Dist. LEXIS 131256 at *11 (M.D. Tenn., Nov. 14, 2011) ("Although the Tennessee Supreme Court has said that the Economic Loss Doctrine is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property, federal courts applying Tennessee law have declined to extend the Economic Loss Doctrine beyond cases involving the sale of goods. Thus, the Economic Loss Doctrine does not bar claims based upon breach of warranties, negligent misrepresentation; fraud; conversion; fraud in the inducement, or claims under the TCPA") (citations omitted).

64.     Defendant Tyler Tech did not simply undertake to install the Odyssey software and then call it a day. To the contrary, Defendant Tyler Tech duties undertook the successful

20

integration of Odyssey in connection with the replacement of the County's entire Computer

Tracking System, as the Contract expressly stated:

> This Statement of Work covers the replacement of the Shelby County's in-house
> developed Court Case Management System, JSS. In conjunction with the replacement of
> JSS, Shelby County will also be replacing JMS – its current Jail Management System
> used by the Jail and IMS – the current Inmate Management System used by the
> Correction Center. The current JMS/IMS/JSS systems are tightly integrated with a
> custom written interface. … These systems will be so integrated that a single system will
> not be able to go live without data exchanges in place from other iCJIS systems.

Specifically, on Page 21 of the Contract between Shelby County and Tyler Technologies for the

"Court Management System" the parties agree that the overarching project includes the

reworking of Shelby County's Jail Management System. These various "systems will be so

integrated that a single system will not be able to go live without the data exchanges in place

from the other iCJIS systems." (Page 23). The contract in question clearly provides that this

process is a holistic reworking and that the jail system is part and parcel with the contracted for

improvements. Defendant Tyler cannot put forward a smokescreen of technical loopholes to its

basic obligations. An integrated system means exactly that – the jail system – was part of said

integration; this is undeniable.

65.     Thus, Defendant Tyler Tech knew that the successful integration of Odyssey was

essential for the full Computer Tracking System to be operational so that, among other things,

inmates would not become "lost" in the Shelby County Jail and that their booking numbers,

charges, bonds and other information would appear at all stages of their incarnations in the

Computer Tracking System.

66.     The Contract's Statement of Work further contained a section titled "Phase 3 –

System Testing," which stated, in pertinent part, "Special attention should be given to this activity.

Best practice traditionally has been to treat this activity as a mock go live, simulating the upcoming milestone go live event."

67.     The Contract's Statement of Work also stated: "The goal for end user acceptance testing is a full end to end test cycle. This testing will verify that all aspects of the project . . . are working seamlessly." Appendix A to this scope of work is a "Project Schedule" which shows this "User Acceptance Testing" as a step to be completed before even training begins. In effect, under the Contract, the County and Defendant Tyler Tech should have fully tested the Odyssey System prior to switching away from JSSi to iCJIS.

68.     Defendant Tyler further undertook the duties of training and supervising the County's employees with respect to Odyssey and its functionality with the iCJIS system. Defendant Tyler failed to properly train and supervise these employees.

69.     Defendant Tyler Tech did not properly integrate Odyssey with the Computer Tracking System and did not properly train County employees so that the Computer Tracking System would work properly, thus causing the wrongful conduct alleged herein. Further, Defendant Tyler Tech failed to properly test Odyssey before the County went "live" with the system.

70     On information and belief, the County intentionally canceled the testing phase of implementation along with other aspects of the implementation process in order to save money.

71.     Defendant Moore and the County were aware that Odyssey was not ready to "go live" immediately prior to its implementation.

72.     In fact, Defendants, individually or collectively, made the determination to defer implementation of the Odyssey System just a few months prior because they knew it was not ready.

22

73.     The decision to implement Odyssey in light of these concerns also constitutes a custom, policy or practice in that the Defendants made a deliberate choice to follow a course of action made from among various alternatives in light of the known concerns about Odyssey and the Defendants were the officials responsible for establishing the final policy with regard to implementing a system adequate to protect the constitutional rights of the public and pre-trial detainees.

**D.     Ignoring these Warnings, the Sheriff and the County Adopt and Defendants Moore, McGhee, and Hammons Implement the Odyssey System and the Violation of Arrestees' Rights Ensues.**

74.     Notwithstanding these serious storm warnings, the Sheriff and County determined nevertheless to contract with Defendant Tyler Tech to install and implement the Odyssey Case Management System. Specifically, on November 1, 2016, Defendants Oldham, Moore, McGhee and Hammons terminated the Jail's use and reliance on JSSi and began to record all arrest and inmate activity by hand. The on November 7, 2016, Defendants Oldham, Moore, McGhee and Hammons made the decision, to which they were empowered, to go "live" with the Odyssey Case Management System.

75.     Immediately thereafter, the Class Members as defined below became subject to a Computer Tracking System that could not and would not properly track their arrest records and criminal cases, forcing them to become "lost" in the Jail. On November 15, 2016, General Sessions Criminal Court Judge Anderson characterized the County's failures as follows:

> I apologize for the system. I don't know what the problem is. Nobody can tell me what the problem is, where the problems are. That's just a terrible example of the problems we are having. You know I'm not an IT person, I don't understand how computers operate. It's not my job. My job is to make sure that people who are charged with criminal offenses have their day in court in a timely manner, have a bond set & get the opportunity to process their selves thru the system. They're just charged not convicted. I'm not talking about a single person that's been convicted. Every single person I'm talking about that comes in my court initially are only charged with criminal offenses. Nobody has been convicted of a thing.

You called this a debacle? The way I've seen it in the last week and a half, that's the best way I can come up with. They are doing the best they can but much of this should have been anticipated.

I've been told this company has been implemented in numerous big cities across the country. I can't believe we're the first ones to have these terrible problems. And one person being in jail too long is bad enough, but 15, 20, 30. I went down last weekend, last Thursday before the holiday and I walked thru the jail and went to a booking session. He was sleeping on the floor, people sleeping in chairs. There was no movement. It was terrible. I mean it was unbelievable. I thought how could this be happening in Shelby County where our system has flowed so smoothly since I've been a judge. Frankly, it's worked very well for years. We expected problems but we didn't expect problems of this magnitude, where people remain and languish in jail without even getting a bond set, without having court appearance set and us not even knowing how to go about solving the problem. ...how do you lose somebody in the system for three weeks...That's an excellent question. I'm going to try to get answers to that. I'm not able to get answers to get. Kinda like running into one wall after another, anytime I ask questions "how did this happen" they said it's not our fault, it was their fault. I go the next person, it wasn't our fault. We never get to the bottom line, we never get to the end person that the buck stops at. And the only thing I can think of it's the computer system.

Everybody says it's the comp. system. Well, fine, but I've got to get people into court. I understand that answer, you can only do the best you can do and they obviously did not anticipate problems of this magnitude you've heard. Every single group that has been asked has thrown out 6, 7, 8, 9 different problems. Now that takes time obviously. The question I suppose is why hasn't more of this anticipated on the front end before. In a city this size, in a county this size, in a magnitude of having a computer system that's archaic but worked fine before fine. And a computer system that's going to be the way of the future doesn't talk to the archaic one. They should have anticipated that this is going to be a problem. Maybe it's like you speak English and I speak French. We are two people but you don't understand French. It's not helping me to talk to you. That's what I am hearing in there. ...rights being violated & the Constitution? Well, it's very simple, it's what I do for a living, that the oath I took, what I have to do is to make sure the criminal justice system flows.

76.     The County and Defendants Oldham, Moore, McGhee and Hammons acknowledged these problems but took no action to terminate the current method of tracking Plaintiffs and the Class Members so as to prevent the wrongful dentitions.

77.     Shelby County Sheriff's Department representative Earle Farrell gave an interview on November 4, 2016, days after implementation, in which he acknowledged that the intake

process was taking six times as long as usual. (Plaintiffs contend that this was a gross understatement.)

78.     Despite this acknowledgment of the problem Mr. Farrell stated: "I guess my advice to anybody out there having a delay getting out of jail: don't be arrested. There's an idea for you."

79.     One or more of the Defendants have asserted that they should have returned to the use of JSSi following the flawed implementation of Odyssey but did not do so for budgetary reasons.

80.     As a result, the County had no effective ability to determine and ensure: (i) that arrestees with pre-set bonds in their arrest warrants or other instruments authorizing detention could post such bonds and be released, (ii) ensure that no arrestee was detained longer than forty-eight (48) hours prior to probable cause determination, (iii) that those arrestees who had in fact posted bond were released, (iv) that those arrestees who had their charges against dismissed were released, and/or (v) that those who had been arrested and released would not be re-arrested on the same warrant.

81.     On information and belief, the above-referenced problems continue to persist as of the date of filing of this pleading.

82.     The decision not to implement a return to JSSi, a system of using paper records or to implement some alternative set of procedures to ensure compliance with constitutional requirements in light of the serious and well-known flaws with Odyssey also constitutes a custom, policy or practice in that the Defendants made a deliberate choice to follow a course of action made from among various alternatives and the Defendants were the officials responsible for establishing the final policy with regard to implementing a system adequate to protect the constitutional rights of the public and pre-trial detainees. As a result, Defendants Oldham, Moore,

McGhee and Hammons were each aware of the unlawful dentitions that were taking place at the hands of their subordinates and knowingly acquiesced in this unconstitutional conduct.

**E.     Damages**

83.     Plaintiffs and the Class Members have sustained damages as the result of the unlawful dentition proximately caused by Defendants' acts and omission. These damages include two distinct types.

84.     First, having been unlawfully deprived of their liberty, Plaintiffs and the Class Members are entitled to compensatory damages for the loss of "intangible rights" which "redress the denial of free movement and the violation done to [an individual's] dignity as a result of the unlawful dentition, and not the physical and mental injuries arising from the incident." *Rhoades v. Lauderale County, Tennessee,* No. 2:10-cv-02068-JPM-dkv, 2012 U.S. Dist. LEXIS 13922 at *31 (W.D. Tenn. Sept. 24, 2012), quoting *Martinez v. Port Auth. of N.Y.,* 2005 U.S. Dist. LEXIS19141, 2005 WL 2143333 at *19 (S.D.N.Y Sept. 2, 2005).

85.     Plaintiffs assert that each named Plaintiff and each Class Member is entitled to $48,000 per day that they were unlawfully incarcerated or unlawfully re-incarcerated (approximately $2,000 per hour) for their loss of liberty. *See Rhoades v. Lauderale County, Tennessee,* 2012 U.S. Dist. LEXIS 13922 at *32 (awarding $72,000 ($2,000 per hour) to husband and $72,000 ($2,000 per hour) to wife who were unlawfully detained for 36 hours).

86.     Upon information and belief, Plaintiffs anticipate that at least 1000 Class Members were unlawfully detained an average of three (3) days. As such, Plaintiffs allege that the damages to themselves and the Class defined below is $144,000,000.00.

87.    Second, Plaintiffs and the Class Members are entitled to damages for "tangible injury," as each suffered embarrassment, emotional suffering, and/or physical harm, to be determined by the trier of fact.

88.    Plaintiffs reserve the right to amend this allegation based upon the discovery that will be conducted in this action.

### V.    CLASS ACTION ALLEGATIONS

89.    The named Plaintiffs bring this action as a Class Action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and pursuant to Rules 23(b)(1), 23(b)(2) and/or 23(b)(3) defines the class as follows:

> From November 1, 2016 to the present, Plaintiffs, and all of similarly situated persons who were arrested and incarcerated in the Shelby County Jail and who:
>
> (i) were previously or will be in the future denied the ability to post bonds that were pre-set,
>
> (ii) were previously or will be in the future detained longer than forty-eight (48) hours prior to probable cause determination and who were or will be either released for lack of probable cause or had or will have criminal bonds set which were or will be posted,
>
> (iii) were previously or will be in the future detained longer than six hours after posting their required bonds,
>
> (iv) were previously or will be in the future detained longer than six hours after charges against them had been dismissed or it was determined that probable cause did not exist to detain them, and/or
>
> (v) were previously or will be in the future re-arrested on warrants that had previously been served and satisfied (i.e., were re-arrested on the identical warrant that had been previously served).

Excluded from the Class are the named Defendants, their agents, affiliates, and employees, the Judge assigned to this matter and his or her staff.

90.    Numerosity. The requirements of Rule 23(a)(1) are satisfied in that there are too many Class Members for joinder of all of them to be practicable. Upon information and belief, these Class Members exceed over 1000 in number. This Class, as defined above, meets the numerosity requirement.

91.    Commonality. The claims of the Class Members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2). These common legal and factual questions, which may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, include, but are not limited to, the following questions:

(i) Whether the U.S. Constitution protects an arrestee's right to comply with a preset bond and, thus, be released from incarceration.

(ii) Whether the U.S. Constitution protects an arrestee's right to a timely probable cause determination.

(iii) Whether the U.S. Constitution protects an arrestee's right to be released from incarceration upon a criminal court's dismissal of the charges against him or her.

(iv) Whether the U.S. Constitution protects an arrestee's right to be released from incarceration upon posting the required bond.

(v) Whether the U.S. Constitution protects an arrestee's right to be free from incarceration based upon the same warrant that was previously served and satisfied.

(vi) Whether the rights alleged to be protected by the U.S. Constitution set forth in issues (i) through (v) above, were clearly established.

(vii) Whether the acts or omissions of Defendants Oldham, Moore, McGhee and Hammons in connection with adopting and implementing the Odyssey Case Management System were the proximate cause of the constitutional deprivations of Plaintiff and the proposed Class and/or whether these Defendants' failure to properly train and supervise their subordinates with respect to the Odyssey Case Management System was the proximate cause of the constitutional deprivations of Plaintiff and the proposed Class.

(viii) Whether that the County's implementation of its administrative policies amounts to a policy of deliberate indifference and/or inaction to their constitutional rights.

(ix) Whether Tyler Tech owed an ordinary duty of care to Plaintiffs and the proposed Class that its Odyssey system would operate and could be operated in a proper manner such that their rights to be released from incarceration would and could be timely honored.

(x) Whether Tyler Tech breached its ordinary duty of care to Plaintiffs and the proposed Class.

(xi) Whether Tyler Tech breach of its ordinary duty of care to Plaintiffs and the proposed Class has proximately caused them damages.

(xii) Whether Tyler Tech negligently trained and/or supervised its employees and/or the County's employees.

92.     Typicality. The claim of the named Plaintiffs is typical of the unnamed Class Members because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3). For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendant engaged, namely the failure and refusal to honor their Fourth and Fourteenth Amendment rights secured under the U.S. Constitution.

93.     Adequacy of Representation. The requirements of Rule 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to vigorously prosecute their claims on behalf of the Class Members and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other member of the Class.

94.     Further, Plaintiffs have retained competent counsel experienced in civil and class action, and which are competent to bring this class action based on adequate study and proper professional association. These Plaintiffs will diligently prosecute this action, fairly and adequately protecting the interests of the community and/or a class as a whole, if allowed by the Court

95.     Predominance and Superiority. All of the requirements for Rule 23(b)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, the Plaintiffs and the Class Members have suffered a common cause of injury, namely the violation of their due process rights, caused by the common course of conduct engaged in by Defendants. The Class Members' legal claims arise exclusively under Section 1983, 1988, and Tennessee law and, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. *Zuccarini v. Hoechst* (In re Cardizem CD Antitrust Litig.), 200 F.R.D. 326, 335 (E.D. Mich. 2001)("Differences in damages sustained by individual class members does not preclude a showing of typicality nor defeat class certification"); *Bremiller v. Cleveland Psychiatric Inst.,* 898 F. Supp. 572, 579 (N.D. Ohio 1995) ("The above-cited caselaw demonstrates that the

existence of individual damages is not enough to defeat class certification on the commonality element. Therefore, the court declines to decertify the class on this basis") As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance of a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

## VI.    CAUSES OF ACTION

**COUNT 1 –   VIOLATION OF 42 U.S.C. § 1983 (AGAINST DEFENDANTS OLDHAM, MOORE, MCGHEE, HAMMONS IN THEIR INDIVIDUAL CAPACITIES)**

96.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

97.    As alleged above Defendants Oldham, Moore, McGhee and Hammons, acting under color of state law and with deliberate indifference, violated the rights of Plaintiffs and the Class Member secured by the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

98.    It is clearly established that: (i) the failure and refusal to permit an arrestee to post the criminal bonds pre-set in his arrest warrant constitutes the unlawful seizure and detention of the arrestees, (ii) the failure and refusal to afford arrestees a probable cause hearing within forty-eight (48) hours of arrest constitutes an unlawful seizure and detention of the arrestee, (iii) the failure and refusal to release an arrestee who has in fact his posted required bond constitutes and unlawful seizure and detention of the arrestee, (iv) the failure and refusal to release an arrestee who has had the charges against him dismissed, constitutes an unlawful seizure and detention of the arrestee and/or (v) the detention of an arrestee on a warrant that has been served and previously satisfied (i.e., the arrest of a person on the same warrant twice) constitutes an unlawful seizure and detention of the arrestee. These unlawful dentitions were without any legal justification. *Allen v.*

*Thompson,* 14 F. Supp. 3d 885, 896 (W.D. Ky. 2014) ("detaining someone without any justification violates a clearly established right to be free from unlawful dentition"). It would be clear to any reasonable person – let alone any public law enforcement officer – that these actions are wrongful and unconstitutional. As a result, Defendants Oldham, Moore, McGhee and Hammons are not entitled the any affirmative defense of "qualified immunity" for the individual liability.

99.     Defendants Oldham, Moore, McGhee and Hammons, acting with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by adopting and implementing the Odyssey Case Management System.

100.     To the extent that Defendants Oldham, Moore, McGhee and Hammons claim their subordinates are the actual persons who wrongfully detained Plaintiffs and the Class Members and that they were not personally involved themselves, Defendants Oldham, Moore, McGhee and Hammons at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of these offending subordinates. Indeed, almost immediately after Odyssey went live, Defendants became aware of the defects in the Computer Tracking System that were causing the unlawful dentitions. Nevertheless, they each knowingly acquiesced in the continued use of the Odyssey Case Management System. As a result, Defendants Oldham, Moore, McGhee and Hammons are personally liable under Section 1983. *Taylor v. Michigan Dep't of Corrections,* 69 F.3d 76, 81 (6th Cir. 1995) ("At a minimum, a § 1983 plaintiff must how that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate") quoting *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1983).

101.     In the alternative, Defendants Oldham, Moore, McGhee and Hammons, acting with deliberate indifference, failed to properly train and/or their subordinates with respect to the

Odyssey Case Management System, which proximately caused the above described constitutional rights violations.

102.    In the alternative, Defendants Oldham, Moore, McGhee and Hammons, acting with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by failing to implement remedial measures to rectify the systematic constitutional rights violations outlined above after being placed on notice of the actual failure of the Odyssey Case Management System.

**COUNT 2 –   VIOLATION OF 42 U.S.C. § 1983 (AGAINST DEFENDANTS OLDHAM, MOORE, MCGHEE, HAMMONS IN THEIR OFFICIAL CAPACITIES AND, THUS AGAINST SHELBY COUNTY)**

103.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

104.    As alleged above Defendants Oldham, Moore, McGhee and Hammons, acting under color of state law, violated the rights of Plaintiffs and the Class Member secured by the Fourth and Fourteenth Amendments of the U.S. Constitution. It is clearly established that: (i) the failure and refusal to permit an arrestee to post the pre-set bond constitutes the unlawful seizure and detention of the arrestee, (ii) the failure and refusal to afford arrestees a probable cause hearing within forty-eight (48) hours of arrest constitutes an unlawful seizure and detention of the arrestee, (iii) the failure and refusal to release an arrestee who has in fact posted his required bond constitutes and unlawful seizure and detention of the arrestee, (iv) the failure and refusal to release an arrestee who has had the charges against him dismissed, constitutes an unlawful seizure and detention of the arrestee and/or (v) the incarceration of an arrestee on a warrant that has been served and previously satisfied (i.e., the arrest of a person on the same warrant twice) constitutes

an unlawful seizure and detention of the arrestee. These unlawful dentitions were without any legal justification.

105.     The huge and unreasonable delays in the release from custody of Plaintiffs and the Class were not the result of necessary administrative procedures. To the contrary, no matter how "reasonable" the County's criminal administrative policies may appear on their face, the implementation of those policies, through the defective Odyssey system, constitutes a policy of inaction and/or policy amounting to deliberate indifference to the rights of Plaintiffs and the Class Members. Because Plaintiffs and the Class challenge the County's implementation of its criminal administrative policies in toto, Plaintiffs and the Class Members are entitled to have their claims against the County tried to a jury. *See Berry v. Baca,* 379 F.3d 764 (9th Cir. 2004)(in Section 1983 action where arrestees were not released until 29 hours after their charges were dismissed, court held that county's summary judgment must be denied, where plaintiffs alleged that the implementation of the county's administrative procedures in toto amount to deliberate indifference).

**COUNT 3 – NEGLIGENCE AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.**

106.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

107.     As a software company specializing in the development and installation of criminal court and jail inmate tracking computer systems, Defendant Tyler Technologies owed a duty of Reasonable care to Plaintiff and the Class Members to ensure that its Odyssey Case Management System would work in a proper manner such that their rights to be released from incarceration would and could be timely honored.

108.    These duties arose when Defendant Tyler undertook to provide services in connection with the software implementation in its Contract with the County "for Court Management System."

109.    Defendant, however, breached these duties with its development and installation of Odyssey for the Jail.

110.    As a direct and proximate result of the negligence of Defendant Tyler Technologies, Plaintiffs and the Class Members have suffered damages. Under this Count, Plaintiffs and the Class Members do not seek "economic damages" as defined by Tennessee law, including Tenn. Code Ann. § 29-39-101(1), from Defendant Tyler Technologies.

111.    The pleading standard of *Ashcroft vs. Iqbal* does not require the presentation of the labyrinthine technical complexities of reworking a major criminal justice computer system. This Court does not play the role of an IT administrator attempting to figure out what went wrong in terms of technical exactitude. Rather, it is sufficient at the pleading phase that the Plaintiffs have presented a duty of care, a breach and consequential damages.  This standard has been met.

## COUNT 4 –   NEGLIGENT TRAINING AND SUPERVISION AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

112.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

113.    Defendant Tyler Tech had a duty train and supervise its own employees and undertook a duty to train and supervise the County's employees in connection with the integration and operation of the Odyssey Case Management System, so as to ensure that its Odyssey Case Management System would work in a proper manner such that their rights to be released from incarceration would and could be timely honored. *Acuity v. McGhee Eng'g, Inc.,* 297 S.W.3d 718, 734 (Tenn. Ct. App. 2007) ("Tennessee law recognizes an exception to the economic loss doctrine:

despite the absence of privity, a plaintiff may maintain an action for purely economic loss based upon negligent supervision or negligent misrepresentation").

114.     As alleged above, Defendant Tyler Tech failed to properly train and supervise these employees, thus proximately causing the wrongful dentitions alleged herein.

115.     As a direct and proximate result of the negligent supervision of Defendant Tyler Tech, Plaintiffs and the Class Members have suffered damages. Under this Count, Plaintiffs and the Class Members do not seek "economic damages" as defined by Tennessee law, including TENN. CODE ANN. § 29-39-101(1), from Defendant Tyler Technologies.

## VII.   PRAYER FOR RELIEF

WHEREFORE, the named Plaintiff and the Class Members demand judgment against Defendants Tyler Technologies, Bill Oldham, Robert Moore, Charline McGhee, Debra Hammons and Shelby County, Tennessee, on each Count of the Complaint and pray for the following relief:

1.     Issue service of process and serve the Defendant;

2.     Issue an Order certifying that this action may be maintained as a class action, appointing Plaintiffs and their counsel to represent the Class, and directing that reasonable notice of this action be given by Defendants to all Class Members;

3.     Grant any reasonable request to Amend Plaintiff's Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

4.     Empanel a jury to try this matter;

5.     Award each plaintiff Class Member compensatory damages who has suffered same in an aggregate amount of not less than $144,000,000.00;

6.     Award Plaintiffs' their reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

36

7.     Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

8.     Award pre-and post-judgment interest in the amount of 10% per annum pursuant to Tenn. Code Ann. § 47-14-123 in amount according to the proof at trial; and

9.     Grant the Plaintiff and Class Members such further relief as the Court may deem just and proper.

**Dated:**      October 31, 2017

                                                   **Respectfully submitted,**

s/Daniel Lofton
DANIEL O. LOFTON, BPR#27386
2400 Poplar Ave., Ste. 210
Memphis, TN 38112
(901) 526-7837 Phone
dlofton@craigandloftonlaw.com

s/Paul Craig
PAUL F. CRAIG, BPR#18359
2400 Poplar Ave., Ste. 210
Memphis, TN 38112
(901) 526-7837 Phone

s/Steve Wilson
STEVE G. WILSON, BPR#28460
5100 Poplar Ave., Ste. 2700
Memphis, TN 38137
steve@stevewilsonfirm.com

s/Matt Gulotta
MATTHEW C. GULOTTA, BPR#28194
202 Adams Avenue
Memphis, TN 38103
matt@gulottalaw.net

s/Patrick Brooks
PATRICK M. BROOKS BPR#31045
2299 Union Avenue
Memphis TN 38104
patrick@patrickbrookslaw.com

*Attorneys, Plaintiffs/Class Representatives*